1                    UNITED STATES DISTRICT COURT

2                   WESTERN DISTRICT OF LOUISIANA

3                     ALEXANDRIA DIVISION

4   UNITED STATES OF AMERICA        *   CRIMINAL ACTION
                               *   NUMBER 08-00258-02

5                          *

6   vs.                       *   January 12, 2009
                               *   1:36 p.m.

7                          *

   BRADY WITCHER                *   Alexandria, Louisiana
                               *

8   * * * * * * * * * * * * * * * * *

9

10                        CHANGE OF PLEA

11   Certified transcript of proceedings before the Honorable
    Dee D. Drell, United States District Judge.

12

13   APPEARANCES:

14   FOR THE GOVERNMENT:    Cytheria Jernigan
                         United States Attorney's Office

15                        300 Fannin Street, Suite 3201
                        Shreveport, Louisiana 71101-3068

16

   FOR THE DEFENDANT:     Allen L. Smith, III

17                        Law Office of Chris J. Roy, Jr.
                        Post Office Box 1592

18                        Alexandria, Louisiana 71309-1592

19

   REPORTED BY:         Myra Primeaux, RMR, CRR

20                        Post Office Box 348
                        Alexandria, Louisiana 71309-0348

21                        Phone: (318) 442-3080

22

23

24

   Proceedings recorded by mechanical stenography, transcript

25   produced by computer.

1          THE COURT:  Hello, everybody, again.  The last

2     matter on the docket today is *United States v. Brady*

3     *Witcher*.  This is Criminal Docket Number 08-00258.

4          Make your appearances, please.

5          MS. JERNIGAN:  Good afternoon, Your Honor.

6     Cytheria Jernigan on behalf of the government, and seated

7     at the table with me is FBI Special Agent Kevin Plaisance.

8          THE COURT:  All right.  Welcome back.

9          MR. SMITH:  Good afternoon, Your Honor.  Allen

10    Smith on behalf of the defendant, Mr. Brady Witcher, who is

11    present and sitting with me at the table.

12         THE COURT:  All right.  Welcome back to you, too.

13    Mr. Witcher, how are you doing?

14         THE DEFENDANT:  I'm doing fine, sir.  How are

15    you?

16         THE COURT:  All right.  We have some things we

17    have to do this afternoon regarding this case.  My

18    understanding is that Mr. Witcher intends to enter a guilty

19    plea.

20         So let's see if there are any filings from the

21    government at this point.

22         MS. JERNIGAN:  Yes, Your Honor.  We have a

23    completed Rule 11 package which includes a copy of the

24    indictment, the plea agreement, elements of the offense,

25    understanding of the maximum penalty and constitutional

1     rights, signed by all the parties to file with the court.

2              THE COURT:  All right.  Mr. Witcher, I've been

3     handed these documents which include a plea agreement that

4     purports to have your signature on it and also a statement

5     of understanding of rights.  And this is your signature,

6     sir?

7              THE DEFENDANT:  Yes, sir, it is.

8              THE COURT:  And do you have any question about

9     these documents that you've signed?

10             THE DEFENDANT:  No, sir, I don't.

11             THE COURT:  You read them and understand them?

12             THE DEFENDANT:  Yes, sir, I do.

13             THE COURT:  And you can, I guess, of course, read

14    and write the English language?

15             THE DEFENDANT:  Yes, sir, I can.

16             THE COURT:  Okay.  Very good.

17       Well, we have an alleged victim in this case, I guess,

18    since there was someone named M.H. named in the indictment.

19    What about it, Ms. Jernigan, the victim rights --

20    Notification Rights Act, please?

21             MS. JERNIGAN:  It has been complied with, Your

22    Honor.  We have notified the victim.

23             THE COURT:  All right.  And of course, not

24    present.  You don't have any statements from him, I guess.

25             MS. JERNIGAN:  No, Your Honor.

4

1          THE COURT:  Very well.

2      Mr. Witcher, although I'm sure you've conferred with

3  Mr. Smith concerning this case, it's my duty to tell you

4  this afternoon that I'm going to be asking you certain

5  questions that will be answered after you've promised to

6  tell me the truth.  And that being the case, if your

7  answers are substantively inaccurate, you could be charged

8  with perjury.

9      And I'm not saying that to you because I think that

10  you intend to lie to me in any kind of way.  It's just you

11  need to understand the conditions under which you'll answer

12  questions today.  Okay?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  You understand?

15          THE DEFENDANT:  Yes, sir.

16          THE COURT:  All right.  Mr. Smith, how does your

17  client intend to be plead?

18          MR. SMITH:  Guilty, Your Honor.

19          THE COURT:  This is a one-count indictment that

20  alleges assault resulting in serious bodily injury and

21  indicates on or about June 24th, 2008, Jonathan Tompkins

22  and Brady Witcher -- and this is, of course, only Mr.

23  Witcher here today -- at the U.S. Penitentiary in Pollock,

24  forcibly assaulted M.H. who is another inmate in Pollock,

25  and that injury allegedly resulted in serious bodily injury

1    to that other inmate.  And the statute that's alleged to be

2    violated is 18, United States Code Section, 113(a)(6).

3         Mr. Witcher, is it your intention to enter a guilty

4    plea to that charge?

5              THE DEFENDANT:  Yes, sir, it is.

6              THE COURT:  All right.  Even though you may have

7    been advised by Mr. Smith, and I'm sure you have, under

8    Fifth Circuit jurisprudence on what we know as Rule 11, I'm

9    required to address three core concerns with you before I

10   can accept your guilty plea.

11        The first of those is whether the guilty plea is

12   coerced in any kind of way.  The second is whether you

13   understand the nature of the charge against you.  And the

14   third is whether you understand all the consequences of

15   your plea.

16        So I have to ask you a number of questions to be sure

17   that yours is a valid plea.  And if at any time you don't

18   understand me, it's okay for you to stop and turn aside

19   from the microphone and ask Mr. Smith anything you like.

20   Okay?

21             THE DEFENDANT:  Yes, sir.

22             THE COURT:  All right.  Let me get you to raise

23   your right hand at this point.

24        (Defendant sworn.)

25                      EXAMINATION

1    BY THE COURT:

2    Q.   All right.  You understand, once again, having been

3    sworn now, your answers to my questions will subject you to

4    the penalties of perjury or of making a false statement if

5    you don't answer truthfully?

6    A.   Yes, sir.

7    Q.   All right.  Mr. Witcher, what is your age?

8    A.   30.

9    Q.   And your date of birth?

10   A.   11-24-78.

11   Q.   And where are you from, sir?

12   A.   Birmingham, Alabama.

13   Q.   And I assume you got to Louisiana by virtue of your

14   incarceration status?

15   A.   That's correct.

16   Q.   How long have you been -- well, I don't know whether

17   you're at Pollock right now, but how long were you at

18   Pollock?

19   A.   Approximately about four and a half months.

20   Q.   All right.  And how much education do you have?

21   A.   I have a G.E.D., Your Honor.

22   Q.   And how much formal education?

23   A.   7th grade.

24   Q.   And did you have that where you grew up?

25   A.   Yes, sir.

1    Q.    Basically?  All right.  What about your state of mind?

2    Are you presently under a doctor's care for anything?

3    A.    Yes, sir, depression and schizophrenia.

4    Q.    All right.  Well, let's talk about that a little bit.

5    Have you taken any drugs or medicine or pills or

6    anything -- I even have to ask you about alcohol, although

7    I doubt that -- anything that would cause you to be less

8    than clear headed right now?

9    A.    No, sir.

10   Q.    And are you on your medications for this

11   schizophrenia?

12   A.    Yes, sir.

13   Q.    Do you feel like you're pretty clear headed right now?

14   A.    Yes, sir.

15   Q.    And do you have any other mental or physical problems

16   that would limit your ability to understand what's going on

17   here today?

18   A.    No, sir.

19   Q.    You understand the reasons for you being here then?

20   A.    Yes, sir, I do.

21   Q.    Okay.  I want you to understand you have the right to

22   have the assistance of counsel at all stages of the

23   proceedings against you.  And have you had now an ample

24   opportunity to go over this case and discuss it with Mr.

25   Smith?

1    A.   Yes, sir, I have.

2    Q.   Thank you.  And are you satisfied to have him

3    represent you in the case?

4    A.   Yes, sir, I am.

5    Q.   All right.

6              THE COURT:  Mr. Smith, do you have any doubt as

7    to Mr. Witcher's competence to plead at this time?

8              MR. SMITH:  No, I don't, Your Honor.

9    Q.   Okay.  Mr. Witcher, under the Constitution and laws of

10   the United States, you have a right to plead not guilty and

11   to have the charge in this case tried by a jury of 12

12   people, all of whom would have to agree on a verdict.  Do

13   you understand that?

14   A.   Yes, I do.

15   Q.   And also at a trial, you would be presumed to be

16   innocent, and the government would have the burden of

17   proving you guilty beyond a reasonable doubt.  In other

18   words, you wouldn't have to prove your own innocence if you

19   went to trial.  Do you understand that?

20   A.   I do.

21   Q.   And also, in the course of a trial, the witnesses for

22   the government would have to come to court, would have to

23   testify in your presence, and your counsel would be able to

24   confront and cross-examine the witnesses for the

25   government, he could object to evidence offered by the

1    government, and could also offer evidence on your behalf if

2    you chose to have him do that.  Do you understand those

3    things?

4    A.    I do.

5    Q.    And also, if there were favorable witnesses that you

6    felt you wanted to have come to the trial, and if they

7    didn't want to come or for any other reason, you could use

8    the court's subpoena power to make them come.  Do you

9    understand that?

10   A.    I do.

11   Q.    And also at a trial, while you would have the right to

12   testify if you chose to do that, you would also have the

13   right not to be compelled to incriminate yourself, in other

14   words, the right not to testify.  And this right would

15   otherwise be guaranteed to you.  Do you understand that?

16   A.    I do.

17   Q.    And likewise, if you had a trial and you chose not to

18   testify, a jury could not solely for that account convict

19   you on the violation being tried.  And that, of course, do

20   you understand, would be waived by your guilty plea?

21   A.    I do, Your Honor.

22   Q.    All right, sir.  If you continue in the guilty plea

23   and if I accept your plea, you understand that you will

24   have waived your right to a trial and all the other rights

25   I've just discussed?  There will be no further trial, and I

1    will enter a judgment of guilty today just simply based on

2    your guilty plea.

3    A.    Yes, sir, I understand.

4    Q.    Okay.  And likewise, if you continue in the guilty

5    plea, you understand you will have to waive your right not

6    to incriminate yourself, since I will, in a little while,

7    ask you some questions about what you did in order to

8    satisfy myself that you're guilty as charged, and you'll

9    have to acknowledge your guilt here today.

10   A.    Yes, sir.

11   Q.    Are you willing now to waive and give up your right to

12   a trial and all the other rights I've just discussed?

13   A.    I am.

14   Q.    All right.  Mr. Witcher, has anybody threatened you,

15   leaned on you, forced you to plead guilty, or told you that

16   if you don't plead guilty, some other charge will be

17   brought against you or some other adverse action will be

18   taken against you?

19   A.    No, sir.

20   Q.    Okay.  Now, it may well be that you already have a

21   felony conviction, but in this case, you need to understand

22   that this case is also -- this offense is also a felony,

23   and if the plea is accepted to it, you'll be judged guilty

24   of that offense, and that adjudication as a felony may

25   deprive you of valuable civil rights, such as the right to

1    vote, the right to hold public office, the right to serve

2    on a jury, and the right to possess any kind of firearm.

3    Do you understand those things?

4    A.   I do.

5    Q.   All right.  And so are you willing to plead guilty

6    because you are in fact guilty as charged?

7    A.   That's correct.

8    Q.   And may I consider that in this instance a free and

9    completely voluntary act on your part?

10   A.   That's correct.

11   Q.   All right.  Now, I assume that you saw and have

12   reviewed a copy of the indictment itself?

13   A.   Yes, sir, I have.

14   Q.   All right.  And you've discussed that with Mr. Smith?

15   A.   Yes, sir, I have.

16   Q.   All right.  Even though, of course, you've discussed

17   those matters, I'm required to tell you about this

18   indictment and what the government would have to prove

19   beyond a reasonable doubt if you had a trial on this

20   charge.

21        The indictment is a single count indictment, and

22   Count 1 charges a violation of 18, United States Code,

23   Section 113(a)(6), in this case, assault resulting in

24   serious bodily injury.

25        And particularly, it indicates that on or about

1    June 24th, 2008, at Pollock, U.S. Penitentiary in Pollock

2    in the Western District, you and Jonathan Tompkins forcibly

3    assaulted, as I said, somebody named M.H. who was an inmate

4    at Pollock at the time, and that resulted in serious bodily

5    injury to M.H.

6         Now, to prove that particular case, in order to find

7    you guilty, the government would have to prove, first, that

8    you intentionally struck or wounded the victim, and second,

9    that as a result, the victim suffered serious bodily

10   injury.  And serious bodily injury, of course, is defined

11   in the statute.  And the government would have to prove

12   each of those elements beyond a reasonable doubt for you to

13   be convicted of assault resulting in serious bodily injury.

14        Do you understand that charge and those elements?

15   A.   Yes, sir, I do.

16   Q.   All right.  Do you have any questions about those or

17   anything we've done to this point?

18   A.   No, sir, I don't.

19   Q.   The maximum possible penalty for this single count

20   indictment is not more than ten years in jail, plus a fine

21   of not more than $250,000.  And do you understand that that

22   could be the maximum penalty?

23   A.   Yes, sir, I do.

24   Q.   Have you and Mr. Smith gone over the advisory

25   sentencing guidelines that may apply in this particular

1    case?

2    A.   Yes we have.

3    Q.   He's gone over with you the chart and tried to figure

4    out what the possibilities are for you in a guideline

5    sentence; is that right?

6    A.   Yes, sir.

7    Q.   You understand those guidelines are merely advisory at

8    this point, and the court has the power to make either an

9    upward or a downward departure from the guideline

10   calculations?

11   A.   Yes, sir.

12   Q.   Do you?  Okay.  Also, under the Sentencing Reform Act

13   which is applicable here, you may receive a term of

14   supervised release of not more than three years in length

15   in addition to any term of imprisonment that the court may

16   impose.  You understand that?

17   A.   Yes, sir, I do.

18   Q.   All right.  With regard to supervised release, you

19   need to know that a violation of the conditions of

20   supervised release at any time during the period of that

21   release may result in your being incarcerated for time over

22   and above any period of imprisonment initially ordered by

23   the court.

24        You need to also know the period of incarceration for

25   a violation of a condition of supervised release could be

1    as much as the full term of supervised release initially

2    ordered by the court irrespective of the amount of time of

3    supervised release you had successfully completed.

4        And what all that simply means, just to be clear about

5    it, is that if I should, for example, put you on supervised

6    release for three years following any period of

7    imprisonment that's adjudicated here, and you went on

8    supervised release and you did fine for a year, and you

9    were brought up for violations of the conditions, you could

10   be incarcerated for the full time of three years even

11   though you had already finished what you thought was a

12   year.  Do you understand that?

13   A.    Yes, I do.

14   Q.    Okay.  Plea agreements, of course, are permissible,

15   and the lawyers and you also have a duty to disclose all

16   the terms of such an agreement.  And I see one here.  And I

17   assume your willingness to plead guilty results in some

18   part from the existence of the plea agreement.  Would that

19   be correct?

20   A.    That's correct.

21   Q.    But are you pleading guilty today because you are in

22   fact guilty and not simply because you have a plea

23   agreement?

24   A.    I'm pleading in fact because I'm guilty.

25   Q.    All right.  Anything about that plea agreement, I

1    think I asked you this before, that you don't understand or

2    feel like you need to go over with your counsel or with me?

3    A.   No, sir.

4    Q.   All right.  You need to be informed also upon your

5    conviction, the court must assess you the amount of $100,

6    which is a total of $100.  And normally as a condition of

7    this, the assessment has to be paid by means of a cashier's

8    check or money order.  In cases of people who are

9    incarcerated, that usually gets charged against your prison

10   account.  You understand that?

11   A.   Yes, I do.

12   Q.   All right.

13           THE COURT:  Any problem with that from the

14   government?

15           MS. JERNIGAN:  No, Your Honor.

16           THE COURT:  Very well.

17   Q.   I don't know that there's any restitution to be made

18   in this case, but you need to know that in addition to the

19   penalties I've discussed with you, if restitution is

20   appropriate in any case, the court may order you to make

21   that restitution, and the amount of restitution and the

22   method of payment is entirely within the discretion of the

23   court, in other words, me.  Do you understand that?

24   A.   Yes, I do.

25   Q.   Likewise, to the extent that you cooperate with the

1    government in any way, whether it's in your plea agreement

2    or not, that's an issue that I always look at at the time

3    of sentencing.  Do you understand that?

4    A.   Yes, I do.

5    Q.   Has anybody made any promises to you other than those

6    contained in the plea agreement?

7    A.   No, sir.

8              THE COURT:  Counsel, let me get you-all to

9    indicate whether there are any side agreements of any kind.

10             MS. JERNIGAN:  There is no side agreement, Your

11   Honor.

12             MR. SMITH:  None on behalf of the defendant, Your

13   Honor.

14             THE COURT:  All right.  Very well.

15   Q.   All right.  Mr. Witcher, after today, it is likely

16   that your lawyer or the government's lawyer or both will

17   send me a memorandum arguing for a recommendation of a

18   particular sentence.

19       Do you understand that any recommendation of sentence,

20   whether it's agreed to or not, between the lawyers, is not

21   binding on the court and that you could, just on the basis

22   of your guilty plea, receive a sentence that's more severe

23   than that requested or recommended by any of the lawyers in

24   the case?

25   A.   Yes, sir.

1    Q.   Now, has anybody made any prediction or prophecy or

2    promise to you as to what your sentence will be in the

3    case?

4    A.   No, Your Honor.

5    Q.   You understand that when we get down to sentencing,

6    the way I do this is sentence you first based upon a

7    calculation of the applicable guideline range.  Then I'll

8    consider that range.  I'll consider possible departures

9    under the guidelines.  And then also, I will look at other

10   sentencing factors under 18 U.S.C. Section 3553(a).  Do you

11   understand that?

12   A.   Yes, sir, I do.

13   Q.   All right.  But in the final analysis, do you

14   understand that your sentence is entirely up to me and not

15   up to your lawyer and not up to the government's lawyer?

16   A.   I understand that, sir.

17   Q.   And likewise, do you understand you have a right to

18   appeal any sentence that I impose upon you?

19   A.   Yes, sir, I do.

20   Q.   And know also that the failure of the court to adhere

21   to a sentencing recommendation by any lawyer in the case is

22   not a basis for setting aside your guilty plea.  You

23   understand that?

24   A.   I do.

25   Q.   Also, to the -- let me just check something in this

1    plea agreement.  All right.  This plea agreement, as pretty

2    well standard with plea agreements in this district,

3    provides that this will be -- if you plead guilty

4    successfully, this will be your sole criminal exposure

5    based on the investigation here.  You understand that to be

6    the case?  The government will be bound by that if you

7    plead guilty.  You understand?

8    A.    Yes, sir.

9    Q.    All right.

10            THE COURT:  All right, Ms. Jernigan, you have a

11   witness?

12            MS. JERNIGAN:  Yes, Your Honor.  The government

13   calls Agent Plaisance.

14            THE COURT:  I think you know where the chair is.

15            THE WITNESS:  Yes, sir.

16        (Witness sworn.)

17                        EXAMINATION

18   BY MS. JERNIGAN:

19   Q.    Please state your name and occupation for the record.

20   A.    Kevin Plaisance.  I'm a special agent with the FBI

21   assigned here to the Alexandria office.

22   Q.    Agent Plaisance, are you familiar with the

23   investigation of one Brady Witcher and the reports

24   regarding the same?

25   A.    I am.

1    Q.    On or about June 24th, 2008, where did he reside?

2    A.    He was at the USP Pollock, Louisiana.

3    Q.    And did the defendant, along with Jonathan Tompkins,

4    assault one Matthew Hajek resulting in serious bodily

5    injury?

6    A.    Yes, that's correct.

7    Q.    Could you explain what the investigation revealed

8    regarding the incidents that led up to that assault?

9    A.    Mr. "High-yek" I believe is how you pronounce his

10   name.  I'm just going out on a limb there.  But Mr. Hajek

11   was incarcerated in a cell with -- or shared a cell with

12   Jonathan Tompkins.  That was basically his cell mate.  They

13   had a disagreement over some activity in the cell.  Later

14   that morning, Mr. Hajek was walking to the cafeteria, and

15   it's out in the yard of the prison, and was assaulted by --

16   Q.    Was he walking alone or with other inmates?

17   A.    He was alone, according to his interview I did with

18   him and according to the video surveillance footage.  He

19   was by himself walking across the yard and was assaulted by

20   the defendant and his cell mate, Jonathan Tompkins.

21   Q.    Agent Plaisance, based on the video footage, you just

22   testified that he was alone.  And I just want to clarify

23   that based on the review of the video footage, did it

24   indicate that there were other inmates that were walking as

25   a group from point A to point B that evening?

1    A.   Yes.  The typical day at Pollock is probably other

2    inmates walking to the cafeteria or in the general

3    vicinity.

4    Q.   And what happened as Mr. Hajek in particular was

5    walking?

6    A.   Basically he was assaulted by both the defendant and

7    his cell mate, Tompkins.  He fell to the ground and was

8    continually assaulted.  As a result of that assault, he

9    suffered damage to his facial area, in particular the

10   facial bones.

11   Q.   Were there any weapons involved in the assault?

12   A.   I'm not aware of any weapons other than the use of the

13   hands and feet.

14   Q.   And the injuries that the victim received, what type

15   of treatment did he need in order to treat those injuries?

16   A.   He required surgery which included metal plates placed

17   in his face to hold the bones together.

18   Q.   And did he undergo more than one surgery?

19   A.   I know it was more than one.  I'm not sure the exact

20   number, but it was more than one procedure.

21   Q.   And were there admissions from the co-defendant in

22   this case following the assault?

23   A.   Yes.

24            MS. JERNIGAN:  Your Honor, I tender the witness.

25            THE COURT:  All right.  Mr. Smith, any questions?

1          MR. SMITH:  Yes, I do have a few.

2                    CROSS-EXAMINATION

3     BY MR. SMITH:

4     Q.    Mr. Plaisance, my name is Allen Smith.  I represent

5     the defendant, Mr. Witcher, who is sitting right here next

6     to me.  You described that Mr. "High-yek," is that -- we're

7     going to go with Mr. Hajek.

8     A.    I believe that's how he pronounces his name.

9     Q.    -- shared a cell with Mr. Tompkins and that they had

10    some type of a disagreement, imbroglio, whatnot.  During

11    your interview, did you have an opportunity to ask Mr.

12    Hajek what went on in the cell before this incident?

13    A.    Yes, I did.

14    Q.    What did he tell you?

15    A.    In his words, he said that they had an argument, a

16    verbal argument over the fact that his cell mate liked to

17    brew wine or an alcoholic beverage in the cell, and he

18    didn't agree with that, didn't want to get in trouble with

19    the correctional officers.  They had a heated verbal

20    argument, and then Tompkins left the cell.

21    Q.    Did you have an opportunity, and for lack of a better

22    term, to kind of follow through on this case?  In other

23    words, what happened the day after this incident?  Was

24    there retaliation?  That's where I'm going with it.

25    A.    I'm not entirely sure.  According to Mr. Hajek, he

1   says that there was a retaliation against the person he

2   calls Cane, which is the term he used for the defendant.   I

3   don't know that he knew the defendant's actual name, but

4   evidently there was some sort of retaliation.   I don't know

5   the details behind that.

6   Q.   You weren't assigned to that, the retaliation

7   component?

8   A.   No, I was not.

9           MR. SMITH:   I think that's all I have.   Thank

10   you.

11           THE COURT:   I have one question.

12                          EXAMINATION

13   BY THE COURT:

14   Q.   The incident in the cell occurred on the 23rd or the

15   24th?

16   A.   The same day, Your Honor.

17   Q.   So this was all the same day?

18   A.   Correct.

19   Q.   Oh, I thought it was perhaps the next day.   But then

20   the next day would have been the retaliation, whatever that

21   was.

22   A.   Yes, sir.

23   Q.   Did your investigation show how the co-defendant and

24   Mr. Witcher hooked up together or --

25   A.    No, other than the interview with Mr. Hajek, he

1    recalls seeing the both of them together as he's walking to

2    the cafeteria at a certain point in the facility.

3    According to his testimony, he didn't believe -- he didn't

4    know why they were together.  He didn't suspect that they

5    were about to assault him.

6              THE COURT:  All right.  Any questions generated

7    by mine?  Ms. Jernigan.

8              MS. JERNIGAN:  One or two, Your Honor.

9                        EXAMINATION

10   BY MS. JERNIGAN:

11   Q.   Agent Plaisance, was there a letter that the

12   co-defendant in this case wrote following the assault?

13   A.   Yes.  I believe I have a copy of it.

14   Q.   And did he indicate -- what did he say in that letter

15   that shed some light on how the two co-defendants came to

16   both assault the victim, Matthew Hajek?

17   A.   I'd have to look.

18   Q.   In other words, was there an agreement between the two

19   to do so, according to the co-defendant prior to that

20   assault that day?

21   A.   I have the letter here.  I'd have to review it, if you

22   wouldn't mind, before I can testify to that.  It's been a

23   while since I've actually read the letter, so --

24   Q.   Well, that's okay.

25             MS. JERNIGAN:  I'll withdraw the question, Your

1   Honor.

2           THE COURT:  Okay.  It's not real critical to the

3   issue here.

4       All right.  Anything else, Mr. Smith, for the witness?

5           MR. SMITH:  No, Your Honor.

6           THE COURT:  All right.  Thank you very much.  All

7   right, sir.  You may step down and return to your seat at

8   the table.

9       All right, Mr. Witcher, you've heard generally what

10  Agent Plaisance had to say.  Do you have general agreement

11  at least with what came down there?

12          THE DEFENDANT:  Some, Your Honor.

13          THE COURT:  All right.  Well, let me ask you the

14  question this way because this is the most important part

15  of it.  In this one-count indictment on June 24th, 2008, I

16  read you what the indictment indicates and also the

17  elements of the offense, and the question is for you,

18  whether you understand those, first of all.

19          THE DEFENDANT:  Yes, I do, Your Honor.

20          THE COURT:  Do you need me to repeat any of that

21  to you at this point?

22          THE DEFENDANT:  No, I do not.

23          THE COURT:  All right, sir.  The question is,

24  having heard all those essential elements and the nature of

25  the charge against you, do you understand the elements of

1   the offense and agree that you've committed each and every

2   one?

3                    THE DEFENDANT:  That's correct, Your Honor, I do.

4                    THE COURT:  All right.  Then having heard my full

5   explanation to you and also the maximum penalty and all of

6   your rights given up and the consequences of a plea of

7   guilty, I need to ask you, Mr. Witcher, do you wish to

8   continue in your guilty plea?

9                    THE DEFENDANT:  Yes, I do, Your Honor.

10                   THE COURT:  Then I ask you formally, how do you

11  plead to the one-count indictment?

12                   THE DEFENDANT:  Guilty, Your Honor.

13                   THE COURT:  All right.  Thank you.

14      I'm satisfied that Mr. Witcher fully understands the

15  nature of the charge against him and the consequences of a

16  plea of guilty, and I find that the plea entered is

17  voluntarily and knowledgeably entered and it's accepted as

18  entered.  Likewise, the written plea agreement is accepted

19  in accordance with Rule 11(c)(4).

20      With regard to a sentencing date, I have set this case

21  on the calendar for May 7th, 2009, at 9:30 in the morning.

22  And we'll see if that --

23                   MR. SMITH:  Your Honor, if I may.

24                   THE COURT:  Yes.

25                   MR. SMITH:  I know your calendar is very busy.

1    Mr. Witcher has some medical issues and Probation knows

2    about them, some trouble with his eyes and hep C that he

3    was -- he came from Florida initially.

4              THE COURT:  Okay.

5              MR. SMITH:  They put him in Pollock.  This stuff

6    happened in Pollock.  Now he's out in DC-3.  If we could

7    get him sentenced really quickly and back into a federal

8    facility where he can get medical help.  I know your

9    calendar is --

10             THE COURT:  Yeah.  It's really not about my

11   calendar.  It's about whether we can get the presentence

12   report done.  Now, here's what I do in these situations.

13   I'm certainly willing to accommodate an earlier sentencing

14   date, and it may well be that -- when was your conviction

15   that you're doing time on now?

16             THE DEFENDANT:  January 4th, 2007.

17             THE COURT:  And so when were you sentenced on

18   that, in what court?

19             THE DEFENDANT:  May 12th, 2008.

20             THE COURT:  All right.  Well, it may well be that

21   that presentence report from that instance can be gotten

22   and it can be expedited.  Now, I'm not going to jam the

23   probation folks because they've got things lined up, too,

24   and other people to do work on.  But if the information can

25   be completed in time, then just let me know that and

1    contact me, we'll try to fit it in earlier sometime on the

2    calendar, which is the best I can give you at this point.

3    Okay?  So we work with Probation.

4         In fact, Mr. Witcher, let me tell you, you need to

5    work with Mr. Smith to continue to be certain that all the

6    information furnished to Probation Services is accurate

7    and, of course, in this case timely because you'd like to

8    get this concluded.

9              THE DEFENDANT:  Yes, sir.

10             THE COURT:  To the extent you have them, you'll

11   need to give your last five years' tax returns to Probation

12   Services within 45 days.  That may not be necessary, but it

13   just depends on their needs.

14        Now, Counsel, you've heard me say this before, but I

15   have to tell you on the record, because of *Gall v. United*

16   *States*, you are provided an opportunity to argue for

17   whatever sentence you think is appropriate, and you may

18   file a memorandum in support of your position not later

19   than 15 days prior to the sentencing date.  And I will

20   evaluate those arguments, consider the 3553(a) factors to

21   determine whether they support the sentence requested by a

22   party, and so address your briefing accordingly.  And if

23   you need to file an opposition, that ought to be within

24   five days of receipt of the original brief.

25        Likewise, take a look -- I've told you both earlier

1    today in another case, look at Local Criminal Rule 302.2W.

2    You still have to file objections to the presentence report

3    within 14 days, and this memorandum is not a substitute for

4    that.

5         All right then.  Mr. Witcher is already incarcerated

6    and there's no need to order additional detention, but to

7    the extent the record needs to be clear, he's ordered

8    detained to the custody of the United States Marshal on

9    this offense.

10        Anything else that we need to do at this point?

11             MS. JERNIGAN:  Nothing further from the

12   government, Your Honor.

13             MR. SMITH:  Nothing from the defense, Your Honor.

14             THE COURT:  All right.  Just keep me posted on

15   your progress.

16        All right.  Mr. Witcher, keep it cool now.

17             THE DEFENDANT:  Yes, sir, I will.

18             THE COURT:  All right.  We'll be adjourned for

19   the day.

20             (End of proceedings at 2:07 p.m.)

21

22

23

24

25

1                          I N D E X

2    GOVERNMENT WITNESS:

3                         EXAMINATION
                                                         Page
4
     Kevin Plaisance
5
           By Ms. Jernigan........................    18
6          By Mr. Smith...........................    21
           By the Court...........................    22
7          By Ms. Jernigan........................    23

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3           I, Myra Primeaux, Official Court Reporter, do hereby

4    certify that the foregoing pages numbered 1 through 29 do

5    constitute a true and correct record of proceedings had in

6    said Change of Plea to the best of my ability and

7    understanding.

8           I certify that the transcript fees and format comply

9    with those prescribed by the court and the judicial

10   conference of the United States.

11          Subscribed and sworn to this 5th day of February,

12   2009.

13

14                              s/ Myra Primeaux

15                              MYRA PRIMEAUX, RMR, CRR
                                U.S. Court Reporters Office
16                              Post Office Box 348
                                Alexandria, Louisiana 71309
17                              Phone: (318) 442-3080

18

19

20

21

22

23

24

25